IN THE UNITED STATES BANKRUPTCY COURT
WESTERN DISTRICT OF ARKANSAS
EL DORADO DIVISION

IN RE:      CHARLES D. LOTT,                    CASE NO. 1-05-bk-90147M
                                                 (CHAPTER 7)
            DEBTOR.

RENEE S. WILLIAMS, TRUSTEE                                   PLAINTIFF

VS.                              AP NO. 1:07-ap-7160

CHARLES D. LOTT                                             DEFENDANT

### MEMORANDUM OPINION

On December 12, 2005, Charles D. Lott ("Debtor") filed a voluntary petition for
relief under the provisions of Chapter 11 of the United States Bankruptcy Code.   C. Richard
Crockett was authorized to represent the Debtor-In-Possession on March 24, 2006.   No
creditors' committee was formed in the case, and no plan of reorganization was ever
confirmed.  On December 6, 2006, the case was converted to Chapter 7 on motion of the
Debtor, and on December 7, 2006, Renee S. Williams was appointed Chapter 7 Trustee.

On March 2, 2007, the Trustee commenced this adversary proceeding against the
Debtor.   Subsequently, the Trustee, with leave of Court, filed an amended complaint on
October 5, 2007.

In Count I of the amended complaint, the Trustee  alleges that  the Debtor's
discharge should be denied pursuant to 11 U.S.C. § 727(a)(2)(3) and (5).  In Count II, the

1

Trustee seeks turnover, judgment, an accounting, and punitive damages, all of which will be discussed separately below.

The Debtor filed a timely answer pro se denying the allegations of the complaint and a timely answer to the amended complaint denying any wrongdoing but attempting to explain some of the transactions described in the Trustee's complaint.

Hearings were conducted on December 5, 2007, in El Dorado, Arkansas, and on December 14, 2007 and May 16, 2008, in Little Rock, Arkansas. At the conclusion of the third hearing the matter was taken under advisement.[1]

The proceeding before the Court is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(E)&(J)(2006), and the Court has jurisdiction to enter a final judgment in this case. The following shall constitute the Court's findings of fact and conclusions of law pursuant to Federal Rule of Bankruptcy Procedure 7052.

## I.

## FACTS

During the relevant time period, the Debtor lived in rural Calhoun County, Arkansas, on Sponer Ranch, a farm he leased and also the location of Charlie's Welding, a steel fabrication business that he operated. (Tr. 1 at 32.)   The address of his unincorporated business was Highway 78 West, Hampton, Arkansas. (Pl.'s Ex. 1.) The

---

[1]In citations to testimony, transcripts of the three hearings will be referred to as Tr. 1 (first hearing), Tr. 2 (second hearing), and Tr. 3 (third hearing). Because of the confusion inherent in keeping the record open for three separate hearings, the last two exhibits introduced at the third hearing were erroneously numbered Plaintiff's Exhibit 44 and 45.  These numbers had already been assigned to other documents at the previous hearings. Therefore, the last two exhibits will be renamed Plaintiff's Exhibit 44-2 and 45-2.

Debtor is married to Beth Lott, and they have two sons, Matthew and Cody.  In January

2006, Matthew was 19 years old and Cody was 24 years old.

     After the Debtor filed his Chapter 11 petition on December 12, 2005, he operated as

an individual Chapter 11 Debtor-In-Possession.  The Debtor testified that he engaged in the

steel fabrication business  from the petition date until July 2006 when Charlie's Welding

ceased doing business.  (Tr. 1 at 30.)

     From January 2006 through July 2006, the Debtor served one major customer named

Brandt, a business located in Houston, Texas.  He also had other  customers including Shaw

Process  and Pense Brothers Drilling. (Pl.'s Ex. 44-2 at 1-2).  The Debtor's contract with

Brandt originally called for the Debtor to fabricate two mud tank systems for use in oil and

gas drilling.  This contract was later modified by agreement of the parties and called for

Charlie's Welding to complete four additional mud systems.   The Debtor explained that a

"mud system" is a fabricated steel tank with electric motors and paddles used in blending

and mixing fluid for oil rigs.  (Tr. 2 at 47.)

     Beth Lott worked in the business as a secretary and bookkeeper.  (Tr. 1 at 31.)   The

Debtor testified that his wife  kept the books and records, which were sent periodically  via a

computer disc to Marc Emrich, an accountant who  prepared the monthly Chapter 11

operating reports for a portion of the time period when the Chapter 11 case was active.

According to the Debtor,  Emrich  received the bank statements for the debtor-in-possession

account and the payroll account. (Tr.2 at 48.)

     The Debtor stated that the financial transactions of Charlie's Welding were recorded

in a checking ledger book and in a computer program. (Tr.2 at 48-49.)  The Debtor stated

these recorded transactions included  wire  payments to Charlie's Welding, which were sent

to a  bank account or accounts and were recorded  on the company books, checking ledger

and the bookkeeping computer program. (Tr. 2 at 55.)  The Debtor testified that he

furnished his check ledger to the Trustee and that the ledger explained the purpose of any

transfer of funds to or from Charlie's Welding. (Tr. 2 at  57-58.)  The Debtor admitted he

had a copy of the ledger, and it was introduced at the third hearing as Plaintiff's Exhibit 44

(renamed by the Court as Plaintiff's Exhibit 44-2.)  (Tr. 2 at 93,  Tr. 3 at 10.)

     The Debtor's bank record of a debtor-in-possession account reflects total deposits

from January 19, 2006 through November 2006 of $1,282,781.40.   Despite the large

amount of money that had been deposited into the account, the Chapter 7 Trustee testified

that during her tenure as trustee, she has been unable to locate any assets.

**II.**

**<u>COUNT I–FAILURE TO KEEP ADEQUATE RECORDS</u>**

In addition to the facts recited above, the Trustee established certain other facts to

support her objection to discharge under Count I of the complaint with regard to the

Debtor's failure to keep adequate books and records.  Generally, these facts concern  the

Debtor's use of the debtor-in-possession account for personal purposes unrelated to

conducting the business affairs of Charlie's Welding, the failure to keep adequate records of

a cattle-raising venture, and the lack of records to explain wire and telephone transfers from

the debtor-in-possession account.

4

A.

## TRANSFERS NOT IN THE ORDINARY COURSE OF BUSINESS OF CHARLIE'S WELDING

The Trustee introduced evidence that the Debtor used the debtor-in-possession account to pay personal bills through transfers to his wife's bank account, to pay for his sons' college expenses, to pay for his brother's funeral and related travel expenses, and to fund a cattle raising venture with his two sons.

1.

## TRANSFERS TO DEBTOR'S WIFE

The Trustee presented evidence that between January 1, 2006 and June 20, 2006, the Debtor made the following transfers from the debtor-in-possession account to his wife or to his wife's checking account, which bears the number 86168081:[2]

| CHECK OR TRANSFER | DATE | PAYEE | AMOUNT |
|---|---|---|---|
| Debit-Transfer | 3/07/06 | 86168081 | $  400.00 P.Ex.12B |
| Debit-Transfer | 3/22/06 | 86168081 | $4,000.00 P.Ex 12B |
| Debit-Transfer | 4/11/06 | | $6,000.00[3]P.Ex.13B,52B |

---

[2]Debtor-in-possession Check 11 for $300.00 to Beth Lott written January 28, 2006, was designated as payment for office supplies on the Ledger.  (Pl.'s Ex. 44-2 at 1.)  Debtor-in-possession Check number 1001 for $1,000.00 to Beth Lott written May 4, 2006 was designated on the Ledger as payment related to business travel. (Pl.'s Ex. 44-1 at 14.)  Because there is evidence the funds were for legitimate debtor-in-possession expenses, neither  check will be considered in this discussion on suspicious transfers to Beth Lott.

[3]From a debit transfer of $9672.01 from the debtor-in-possession account, Beth Lott received $500.00 in cash and her account was credited with $5500.00.  The remainder

| | | | |
|---|---|---|---|
| Telephone Transfer | 5/31/06 | 86168081 | $1,800.00 P.Ex.14A, 30 |
| Telephone Transfer | 6/02/06 | 86168081 | $1,000.00 P.Ex.15, 30 |
| Telephone Transfer | 6/12/06 | 86168081 | $3,000.00 P.Ex.15A, 30 |
| Telephone Transfer | 6/20/06 | 86168081 | $5,000.00 P.Ex.15A, 30 |

$ 21,200.00

The Debtor testified that both he and his wife worked for Charlie's Welding but because they did not draw a salary, they took funds from the business as needed for personal expenses. The evidence above shows that in March, April, May, and June, while the Chapter 11 was ongoing, the Debtor transferred an approximate average of $5000.00 a month from the business account to his wife's checking account. The Ledger shows no evidence of payroll checks made out to Charles or Beth Lott during March, April, or May. However, from June 9, 2006 to July 21, 2006, it appears that Charles Lott placed himself on the payroll, drawing seven checks from the debtor-in-possession account in amounts of either $310.78 or $527.10. (Pl.'s Ex. 44-2 at 23, 25, 28, 30, 33, 35, 36.)

The Debtor stated that Emrich instructed him to pay personal expenses out of the debtor-in-possession account because the CPA advised the Debtor to maintain only one account. (Tr. 2 at 56.) He said for that reason, he used an account in Beth Lott's name for only a brief period, but bank records show transfers from the debtor-in-possession account for at least four months while the Chapter 11 was ongoing. Moreover, the Trustee also adduced evidence that for some period not shown by the record, the Debtor maintained at least two debtor-in-possession accounts at Simmons Bank.

---

of the transfer, $3672.01, funded a cashier's check to Connors College for tuition for Matthew Lott. (Pl.'s Ex. 52.)

6

The Debtor offered no record or accounting of how the money deposited in Beth Lott's account was spent.  The Debtor stated he did not  know how  the money deposited to his wife's account was spent, but it might have been used to pay bills.  (Tr.2 at 85.)

2.

TRANSFERS RELATED TO  THE FUNERAL OF THE DEBTOR'S  BROTHER

In March 2006, the Debtor and his wife visited his seriously-ill brother, who resided in New Mexico.   The Debtor's brother ultimately passed away, and the Debtor and his family again traveled out of state in May to attend  the funeral.   Expenses for the two trips and  the funeral itself were paid out of the debtor-in-possession account in the following amounts:

| DATE | PAYEE | AMOUNT |
|------|-------|--------|
| 3/28/06 | Southwest Air Debit | $   361.20 |
| 3/28/06 | Southwest Air Debit | $   361.20 |
| 3/29/06 | Budget Rent-A-Car | $     83.62 |
| 5/01/06 | Debit American Air | $   258.70 |
| 5/01/06 | Debit American Air | $   337.70 |
| 5/01/06 | Southwest Air | $   363.70 |
| 5/01/06 | Southwest Air | $   363.70 |
| 5/02/06 | Enterprise Auto | $   200.00 |
| 5/02/06 | Wheeler Mortuary | $6,505.93 |
| 5/03/06 | Enterprise Auto | $     11.42 |
|  |  | $8,847.17 |

(Pl.'s Ex. 12A, 14.)

3.

TRANSFERS TO OR FOR THE BENEFIT OF CODY AND MATTHEW LOTT

7

Between April 10, 2006 and September 11, 2006, the Debtor transferred funds from the debtor-in-possession account to or for the benefit of his sons, Cody and Matthew Lott, in the following amounts: [4]

| CHECK NO. | DATE | PAYEE | AMOUNT |
|-----------|------|-------|--------|
| 1238 | 4/12/06 | Cody Lott | $2,000.00 |
| 1454 | 5/05/06 | Cody Lott-College | $1,400.00 |
| 1028-2 | 5/10/06 | Cody Lott | $  350.00 |
| Cashier's check | 5/10/06 | Conner State College | |
| See FN 3 above | | Matthew | $3,672.01 |
| 1643 | 5/30/06 | South Arkansas Univ. | $  690.00 |
| 1871 | 6/20/06 | Cody Lott | $4,000.00 |
| 2205 | 7/06/06 | Sweetser Prop. - | |
| | | Cody Apt. | $  625.00 |
| | 9/11/06 | Cody Lott | |
| | | Trailer Payment | $  400.00 |
| | | | $13,137.01 |

(Pl.'s Ex. 13-C, 14-B, 14-F, 15-A, 52-A, 15-F, 16-C, 18-C.)

4.

<u>TRANSFERS TO DEFRAY CATTLE RAISING EXPENSES</u>

<u>FAILURE TO KEEP RECORDS RELATED TO THE CATTLE RAISING VENTURE</u>

The Debtor testified that his sons began in their youth to purchase and raise cattle for show and that he held no interest in his sons' herd as it existed at the time of the trials. Despite his absence of ownership, numerous checks were written between January 25 and July 15, 2006, on the debtor-in-possession account for expenses related to cattle raising and

---

[4]Not included in this list are the following checks, which the Ledger's memo justifies as legitimate business expenses: Check number 1228 dated April 10, 2006, to Matthew Lott for $300.00; Check number1011-2 dated May 8, 2006, to Matthew Lott for $1000.00; and numerous payroll checks to both sons in the amounts of either $527.10 or $310.78. (See Pl.'s Ex. 44-2 at 7, 15.) The Debtor testified that his sons worked at Charlie's Welding during the period in question.

farm maintenance.   Evidence of payment from the account includes the following checks:

| **DATE** | **CHECK NO.** | **PAYEE** | **AMOUNT** |
|---|---|---|---|
| 1/25/06 | 9 | Circle A Feed | $     491.84 |
| 2/10/06 | 1023 | Circle A Feed | $     369.82 |
| 2/11/06 | 1025 | Haynes  Feed | $     109.80 |
| 2/14/06 | 1028 | Haynes Feed | $       22.00 |
| 2/14/06 | 1029 | Camden Animal Hospital | $     273.00 |
| 2/16/06 | 1034 | Circle A Feed | $     218.00 |
| 2/23/06 | 1057 | Big Branch Breeder | $     300.00 |
| 3/08/06 | 1096 | Circle A Feed | $     275.30 |
| 3/20/06 | 1124 | Henley  Feed | $     792.29 |
| 3/21/06 | 1132 | Circle A Feed | $     529.63 |
| 3/28/06 | 1148 | Haynes Feed & Supply | $       17.00 |
| 4/06/06 | 1212 | Circle A Feed | $     504.30 |
| 4/10/06 | 1233 | Haynes Feed & Supply | $ 4,141.90 |
| 4/10/06 | 1237 | Circle A Feed | $     564.80 |
| 4/12/06 | 1242 | Mid-Oklahoma Co-op | $     507.18 |
| 4/19/06 | 1298 | Circle A Feed | $     966.57 |
| 4/20/06 | 1344 | Bennie Chastain | $     650.00 |
| 5/08/06 | 1459 | John Deere-tractor payment | $     666.67 |
| 5/09/06 | 1021-2 | Circle A Feed | $     466.40* |
| 5/16/06 | 1511 | Circle A Feed | $     757.60 |
| 5/23/06 | 1568 | Haynes Feed & Supply | $     636.44 |
| 6/01/06 | 1787 | John Deere | $     666.67 |
| 6/13/06 | 1799 | Circle A Feed | $ 3,310.31 |
| 6/23/06 | 1932 | Circle A Feed | $     268.90 |
| 6/29/06 | 1037-2 | Circle A Feed | $     123.84 |
| 7/06/06 | 2204 | John Deere-tractor payment | $     666.67 |
| 7/14/06 | 2147 | Haynes Feed | $     127.90 |
| 7/14/06 | 2153 | Ag-Pro | $ 2,346.07 |
| 7/14/06 | 2200 | Circle A Feed | $     710.90 |
| 7/15/06 | 2207 | Ag Pro | $     481.48 |

TOTAL:        $21,963.28

* This payment appears to have been entered on the Ledger twice.

(Pl.'s Ex. 44-2, 45-2.)

The debtor-in-possession bank account and operating reports indicate no income

from the sale of cattle.   Thus, it appears the  funds paid from the debtor-in-possession

account to support the cattle operation were generated solely by income from Charlie's

Welding. The Debtor admitted that he helped his sons with some of the feed expense,

although the large amount expended supports an inference that he used the debtor-in-

possession account to defray  most of the expenses throughout  the period when the Chapter

11 was active.  (Tr. 1 at 46.)

The Debtor said that for years his sons had  raised cattle under the auspices of the

FFA (presumably the Future Farmers of America).   He testified that his sons initially

borrowed $5,000.00 each from the county extension service  to  purchase 15 or 16 head of

cattle.  The Debtor described the cattle as "show cattle." (Tr. 1 at 42.)   He stated,

> The show cattle was coming from doing AI transfers to the cattle that they
> had.  And the offspring was the show calves.  And they would go out and buy
> some show calves from time to time.  They would make their winnings at the
> shows, and if they got into the state - - if they got into the premium sale
> sometimes they'd make pretty good money.  And that's where they would
> buy their next show calves for next year.

(Tr. 1 at  42, 43.)

When the Debtor was shown a check dated December 30, 2004, payable to Jacs

Ranch for $4,100.00 with the notation "Cody Lott - Angus Heifers,"  he acknowledged that

he helped his son Cody purchase cattle even though he previously testified that his sons had

purchased cattle with the proceeds of a county extension loan.   (Tr. 2 at 74, Pl.'s Ex. 23A.)

 He described the purchase from Jacs Ranch as a purchase of a single calf for Cody.  (Tr. 2

at 85, 96.) [5]   The Debtor said he had, in the past, also purchased some cattle for himself, but

-----

[5] Although no evidence was introduced on the issue, $4,100.00 for one calf seems
extraordinarily high.  Furthermore, the check notation refers to "heifers" in the plural.

that in 2002 he sold all the cattle that had belonged to him.  (Tr. 1 at 40.)

Apparently, the cattle raising operation, which was started when the Lott sons were youth,  continued for years and the cattle were raised  on Sponer Ranch while the Debtor leased the  property from 2005 to 2007.  (Tr. 1 at 39.)  The Debtor estimated that 40 head of cattle were located on Sponer Ranch the day the Chapter 11 petition was filed.  Later, in the second trial, the Debtor testified that there were only 10 to 13 head remaining when the case was filed. (Tr. 2 at 97.)

The Debtor stated several times in his testimony that when the bankruptcy was filed he owned no interest in cattle.   (Tr.2 at 96.)  Moreover, the Debtor's original Chapter 11 petition indicated in Schedule B--Question 31 that he owned no cattle.

However, the Debtor's proposed plan of reorganization filed October 10, 2006, mentioned in Article IV that the Debtor's business included hay and cattle farming. (Chapter 11 Small Business Plan, ECF Docket No. 167.)  In an amended statement of financial affairs filed just prior to the conversion to Chapter 7, the Debtor responded to Question 14 that he held a one-half interest with his sons in a  cattle herd valued in total at $22,000.00 and located on the Debtor's farm. (ECF Docket No. 220.)  Prior to conversion to Chapter 7, he also claimed as exempt a portion of his one-half interest in the herd on Amended Schedule C.  (Amended Schedule C, ECF Docket No. 219. ) He repeated this claim on a second  Amended Schedule C filed March 16, 2007.  (See Amended Schedule C, ECF Docket No. 295 & 298.)

---

According to the Court's analysis of the debtor-in-possession bank records, the Debtor transferred $21,963.28 between January 25, 2006 and July 15, 2006, to pay for feed and other expenses of the cattle operation.  His testimony  under oath is that the existing cattle all belong to his sons, although he states in his petition under oath that he owns a one-half interest in the same herd, valued in total at  $22,000.00,  and that he claims an exemption in his portion of the herd pursuant to 11 U.S.C. § 522.

When confronted with the inconsistency in his testimony about the ownership of the cattle, the Debtor stated, "That's what my bankruptcy says so I'll stand by it, but . . . my boys' cattle are my boys' cattle."  (Tr. 2 at 96.)  The Court is uncertain  which statement is the truth and which statement is a false oath.  One of them has to be false.

The Debtor stated he transported the cattle to Oklahoma when he moved there in 2007, and that as of the date of the first hearing, the cattle herd had dwindled to about seven head.

B.

## TRANSFERS IN CASH OR OTHERWISE  UNIDENTIFIABLE ELECTRONIC TRANSFERS

Between January 19 and September 25, 2006, the Debtor made numerous transfers from two  Debtor-in-Possession  accounts, Simmons Bank Account  86168065 and Simmons Bank Account 86168073.  The transfers cannot be identified by payee and/ or purpose.  The Trustee offered a compilation of these suspect transfers as Plaintiff's Exhibit 28.

Upon review of the record, the Court has identified several of the items in the compilation as transfers to the Debtor's family members or transfers related to the funeral of

the Debtor's brother. These transfers have been itemized in the appropriate lists above and deleted from the unidentifiable transfers below. Also, several of the transfers listed on Plaintiff's Exhibit 28 have been deleted by the Court because the Trustee has failed to prove the transfers were not made in the ordinary course of business.[6]

After deleting those items from the list, the following transfers remain unidentified as to purpose and/or payee:

Transfers from Simmons Bank Account 86168065

| DATE | TRANSFER | AMOUNT |
| --- | --- | --- |

---

[6] Business-related transfers deleted from the Trustee's list on Plaintiff's Exhibit 28 include the following: Transfer on March 17, 2006, to purchase cashier's check for $17,362.12; transfer on March 22, 2006, to purchase cashier's check for $17,981.81; Wire transfer on May 5, 2006, to LeTourneau for $28,700.00; Check number 1558 on May 20, 2006, to SOV for $4,618.85; Check number 1554 on May 22, 2006, for cash in the sum of $504.00; and Check number 1866 on June 16, 2006, to Murphy Motors for $11,158.43.

| Date | Description | Amount | Exhibit |
|---|---|---|---|
| 1/19/06 | Transfer[7] | $ 3,200.00 | Pl.'s Ex.10 |
| 1/23/06 | Telephone Transfer | $ 2,800.00 | Pl.'s Ex. 10 |
| 2/01/06 | Telephone Transfer | $ 175.00 | Pl.'s Ex. 11 |
| 2/08/06 | Telephone Transfer | $ 2,200.00 | Pl.'s Ex. 11 |
| 2/15/06 | Debit | $ 700.00 | Pl.'s Ex.11A |
| 2/15/06 | Debit | $ 1,100.00 | Pl.'s Ex. 11A |
| 2/21/06 | Telephone Transfer | $ 200.00 | Pl.'s Ex. 11 |
| 2/24/06 | ATM | $ 352.00 | Pl.'s Ex. 11 |
| 2/27/06 | ATM | $ 352.00 | Pl.'s Ex. 11 |
| 3/13/06 | Deducted from DIP Deposit | $ 5,400.00 | Pl.'s Ex 12B |
| 3/16/06 | Telephone Transfer | $ 3,160.12 | Pl.'s Ex. 12 |
| 3/24/06 | ATM | $ 252.00 | Pl.'s Ex. 12 |
| 3/30/06 | Wire Transfer | $ 30,000.00 | Pl.'s Ex. 12A |
| 3/30/06 | Telephone Transfer | $ 2,000.00 | Pl.'s Ex. 12A |
| 3/31/06 | Telephone Transfer | $ 1,000.00 | Pl.'s Ex. 12A |
| 4/07/06 | Telephone Transfer | $ 2,000.00 | Pl.'s Ex. 13 |
| 4/19/08 | Telephone Transfer | $ 5,000.00 | Pl.'s Ex. 13 |
| 4/21/06 | Cash | $ 3,000.00 | Pl.'s Ex. 13A,B |
| 4/27/06 | Wire Transfer | $ 3,200.00 | Pl.'s Ex. 13A,B |
| 5/02/06 | Telephone Transfer | $ 2,000.00 | Pl.'s Ex. 14 |
| 5/19/06 | Cash | $ 1,500.00 | Pl.'s Ex. 14A,C |
| 5/31/06 | Telephone Transfer | $ 1,000.00 | Pl.'s Ex. 15 |
| 6/21/06 | ATM | $ 252.00 | Pl.'s Ex. 15A |
| 7/12/06 | Telephone Transfer | $ 7,000.00 | Pl.'s Ex. 16A |
| 7/17/06 | Telephone Transfer | $ 6,000.00 | Pl.'s Ex. 16A |
| 8/28/06 | Cash   Debit | $ 8,000.00 | Pl.'s Ex. 17B,C |
| 9/01/06 | Telephone Transfer | $ 400.00 | Pl.'s Ex. 18 |
| 9/11/06 | Telephone Transfer | $ 2,500.00 | Pl.'s Ex. 18A |
| 9/12/06 | Charles Lott | $ 974.40 | Pl.'s Ex. 18B |
| 9/18/06 | Cash Withheld from Deposit | $ 3,178.00 | Pl.'s Ex. 18B |
| 9/25/06 | Telephone Transfer | $ 600.00 | Pl.'s Ex. 18A |
| | Subtotal | $ 99,495.52 | |

---

[7]This transfer to an unidentified bank account was added by the Court. The Debtor explained that the transfer was used to fund a payroll account but the Ledger shows that payroll checks were written on the debtor-in-possession account numbered 86168065 beginning February 2, 2006. (Pl.'s Ex. 44-2.) Additionally, Plaintiff's Exhibit 39, a bank statement for Simmons Bank account numbered 86168111, shows only a $100.00 deposit into the account "to open payroll account" on January 20, 2006. Therefore, the Debtor's explanation is, at the very least, totally inaccurate.

Transfer from Simmons Bank Account 86168073

| | | | |
|---|---|---|---|
| 5/31/06 | Telephone Transfer | $ | 1,000.00 Pl's Ex. 41 |
| | Total | | $100,495.52 |

The Debtor's testimony concerning his bookkeeping methods and the above transfers was inconsistent and did not square with the documentary evidence. When confronted with the various unidentifiable transfers, the Debtor speculated that they were either to fund a payroll account or to pay a business expense. (Tr.2 at 57.) However, the Ledger shows that almost from the beginning of the Chapter 11, payroll was paid directly from the debtor-in-possession account numbered 86168065. (See Pl.'s Ex. 44-2 at 1.)

The Debtor also defended the transfers on the basis that he never paid himself a salary, but instead took funds for living expenses out of the debtor-in-possession account as needed. (Tr.2 at 60.) The Debtor admitted he did not keep track of how much money he took out of the account for personal reasons. (Tr.2 at 98.)

In his testimony, the Debtor asserted that all electronic transfers out of the debtor-in-possession accounts were accounted for by the Ledger, Plaintiff's Exhibit 44-2. He said it would "have an explanation for any wire transfers, cash, checks or anything like that. It's going to have a memo of what it was for." (Tr.2 at 58.) The Debtor further stated that if he needed cash for business purposes, he would have documented any withdrawal as "cash expense money" on the Ledger. (Tr. 2 at 59.)

### III.

### **DENIAL OF DISCHARGE**

15

The Trustee objects to the Debtor's discharge on several grounds pursuant to 11 U.S.C. § 727, including an objection based on the Debtor's alleged failure to maintain adequate books and records. The Bankruptcy Code provides in relevant part that a debtor is entitled to a discharge unless "the debtor has failed to keep or preserve any recorded information . . . from which the debtor's financial condition . . . might be ascertained, unless such failure to act was justified under the circumstances of the case." 11 U.S.C. § 727(a)(3)(2006).

Under this statute, the debtor has an affirmative duty to create records accurately documenting his financial affairs. Peterson v. Scott (In re Scott), 172 F.3d 959, 969 (7th Cir. 1999) (citing In re Juzwiak, 89 F.3d 424, 430 (7th Cir. 1996)); Meridian Bank v. Alten (In re Alten), 958 F.2d 1226, 1230-31 (3d Cir. 1992); In re Connors, 273 B.R. 764, 769-70 (S.D.Ill. 2001) (citing In re Juzwiak, 89 F.3d at 427). The law recognizes that the trustee and creditors in the case are entitled to accurate information showing what property has passed through the debtor's hands prior to bankruptcy. The Debtor's record-keeping must enable his creditors to "learn what he did with his estate." In re Beshears, 196 B.R. 468, 474 (Bankr. E.D.Ark. 1996) (quoting Koufman v. Sheinwald, 83 F.3d 977 (1st Cir. 1936)).

The Code requires written evidence from which the debtor's financial condition may be ascertained. In re Kowalski, 316 B.R. 596, 601 (Bankr. E.D.N.Y. 2004) (citing McCord v. Sethi (In re Sethi), 250 B.R. 831, 838 (Bankr. E.D.N.Y. 2000) (citing Barristers Abstract Corp. v. Caulfield (In re Caulfield), 192 B.R. 808, 823 (Bankr. E.D.N.Y. 1996))). Intent by a debtor to conceal his financial condition is not an element required for denial of discharge

16

based on failure to keep adequate records. <u>St. Francis County Farmers Ass'n. v. Wright (In re Wright)</u>, 353 B.R. 627, 649 (Bankr. E.D. Ark. 2006)(citing <u>In re Pulos</u>, 168 B.R. 682 (Bankr. D.Minn. 1994)); <u>In re Kowalski</u>, 316 B.R. at 602 (citing <u>Thales v. Erdheim (In re Erdheim)</u>, 197 B.R. 23, 29 (Bankr. E.D.N.Y. 1996) (citing <u>In re DeLancey</u>, 58 B.R. 762, 767-68 (Bankr. S.D.N.Y. 1986)))).

In circumstances where the debtor initially filed a Chapter 11 case that was subsequently converted to Chapter 7, failure to keep accurate records documenting the debtor's financial condition during the pendency of the Chapter 11 case can be the basis for denial of discharge under section 727(a)(3). See <u>Clark v. Hiller (In re Hiller)</u>, 148 B.R. 606, 614 (Bankr. D.Colo. 1992) (denying discharge where, among other acts, the debtor dealt in unexplained cash transactions during the pendency of the chapter 11 case), *aff'd,* 179 B.R. 246 (D.Colo. 1994), *vacated on other grounds*, 179 B.R. 253 (D.Colo.1994); <u>Calcasieu Marine Nat'l Bank v. Grimes (In re Grimes)</u>, 58 B.R. 368, 372 (Bankr. W.D.La.1986) (denying discharge based on evidence that debtors failed to keep records during the Chapter 11 case prior to conversion to Chapter 7).

The plaintiff has the burden of proving each element of an objection to discharge by a preponderance of the evidence. <u>Floret v. Sendecky (In re Sendecky)</u>, 283 B.R. 760, 763 (B.A.P. 8th Cir. 2002) (citing <u>Korte v. United States Internal Revenue Serv. (In re Korte)</u>, 262 B.R. 464, 471 (B.A.P. 8th Cir. 2001)). Under an objection to discharge brought pursuant to Section 727(a)(3), the objecting trustee or creditor has the burden of proving that the debtor failed to maintain adequate records and that his failure makes it impossible to

17

ascertain the debtor's financial condition or transactions. <u>Cadle Co. v. Stewart (In re Stewart),</u> 263 B.R. 608, 615 (B.A.P. 10th Cir. 2001) (citing <u>Gullickson v. Brown (In re Brown),</u> 108 F.3d 1290, 1295 (10th Cir. 1997)); <u>Grisham Farm Products v. Keller (In re Keller),</u> 322 B.R. 127, 132 (Bankr. E.D. Ark. 2005) (citing <u>In re Alten,</u> 958 F.2d at 1233 (citing <u>In re Decker,</u> 595 F.2d 185, 187 (3d Cir. 1970))).

Once a creditor introduces proof that the debtor's records are inadequate, the burden shifts to the debtor to prove the inadequacy is justified under all the circumstances of the case. <u>In re Wright</u>, 353 B.R. at 649 (citing <u>In re Womble</u>, 108 Fed. Appx. 993, 2004 WL 2185744 (5th Cir. 2004)).   Factors to be considered in determining whether the debtor's inadequate record-keeping  is justified under the circumstances include the debtor's education, business experience, sophistication, and personal financial structure and the volume and complexity of the debtor's business. <u>In re Wright</u>, 353 B.R. at  650 (citing <u>In re Beshears</u>, 196 B.R. at 474; <u>In re Womble</u>, 108 Fed. Appx. at 996).

The evidence is overwhelming that the  Debtor failed to keep adequate records from which his creditors could have ascertained his financial condition. During the pendency of the Chapter 11, the Debtor had the advice of legal counsel and an accountant, although only minimal oversight by the United States Trustee.[8]  His wife kept the books, and he also had office staff and a computer software program for accounting purposes. Additionally, he

---

[8]A representative of the United States Trustee's office attended the hearing and admitted, in response to the Court's questions about the oversight of the Debtor while a debtor-in-possession,  that "I cannot tell you that, especially in late-2005 and 2006, that we were able to review all the bank statements and all the operating reports on a timely basis, like we normally would." (Tr.2 at 108.)

maintained at least two debtor-in-possession checking accounts and  a separate ledger.

Despite all the professional expertise and the accounting safeguards that were in place, the

Debtor managed, in nine months, to transfer $100,495.52 in funds from his business accounts

to unknown payees for unknown purposes.

When questioned about the transfers that are reflected but not explained in his bank

statements, the Debtor stated that some suppliers would only do business with him if he paid

cash.  Hence the need for the wire and telephone transfers. However, when confronted with

any particular cash transfer,  he  could  only speculate about to whom the money went and

for what purpose.  He leaves the Trustee, his creditors, and this Court to wonder whether he

paid company expenses and vendors with the unaccounted-for transfers, as he insists, or

whether he used the money for personal gain. In short, it is impossible for the Debtor's

creditors to learn from his records what he did with more than $100,000.00 in transfers, and

even the  Debtor himself is at a loss to explain them.

The Debtor claimed that he kept a Ledger  that would clarify the suspect

transactions, but the Ledger does not record  ATM transactions or electronic transfers from

the accounts.   The Ledger  does contain some information about payee and purposes of

checks written on one debtor-in-possession account. However, the Ledger offers no other

information about the Debtor's financial condition because  debits and credits are added

together in one negative column, rendering the calculations useless for accounting purposes.

In addition, the Trustee presented evidence that the last operating report filed with the

Court covered the Debtor's financial transactions only through April 30, 2006.  The Trustee

also presented evidence that  a large payment of $436,800.00 to Charlie's Welding on April

10 was not reflected on the report as either cash or inventory. (Tr.2 at 78.) She testified that

she had no way of knowing what happened to the funds because the April report was the last

accounting filed with the Court and that the Debtor's failure to provide the reports hampered

her ability to ascertain the Debtor's financial condition after April 30, 2006. (Tr.2 at 37.)

The Debtor's explanation was that he was unable to pay his accountant to complete

subsequent reports.

   Not only are the Debtor's records woefully inadequate, but the Debtor failed to justify

the inadequacy.  Although the Debtor appeared to be relatively unsophisticated and perhaps

somewhat uneducated, he had clerical and professional help at his disposal to aid in record-

keeping and to consult about the Chapter 11 process and his duties as a debtor-in-possession.

If the Debtor was indeed unable to pay his accountant to compile his operating reports, it

could well be because he chose instead to spend debtor-in-possession funds  to pay for his

sons' cattle-raising venture,  his sons' college tuition, and  his deceased brother's funeral

expenses.

   Moreover, the Debtor was operating in a highly technical and specialized field,

employing dozens of welders, and able to negotiate at least one fabrication contract that was

potentially worth millions to his company. From January to November 2006, the principal

debtor-in-possession account reflects deposits of $1,282,781.40.   The volume and

complexity of the business supports an inference that the Debtor has  sense enough to know

he should  document each electronic transfer and cash withdrawal and that if he did not do

20

so, he would be unable to later reconstruct from memory an accurate picture of his financial condition.

Furthermore, the transfers to Beth Lott's account amount to an average of $5000.00 over a four-month period.  The Debtor appears to have kept no record of how this money was spent, even though his was an individual Chapter 11.  While $5000.00 a month in living expenses might have been easily justified under the circumstances, the Ledger reflects, and the Debtor so corroborated, that the lion's share of his personal expenses  were improperly paid directly from the debtor-in-possession account rather than from Beth Lott's checking account. There is evidence that the account funded  Cody and Matthew Lott's college education for a total of $13,137.01, their cattle raising venture for $21,963.28, and the Debtor's brother's funeral for $8,847.17. Thus, the transfers to Beth Lott represent only a small portion of the money paid  from the debtor-in-possession account for personal expenses unrelated to the business.  But the real problem for the Debtor is that it is impossible to determine from the Debtor's records exactly how much the debtor-in-possession account actually paid in personal expenses because of all the unexplained cash and electronic transfers.

Finally, the lack of adequate books and records extends to the cattle-raising operation. The evidence shows that the expenses for the venture were paid from  the debtor-in-possession  account, even though the Debtor claimed either no interest or a one-half interest in the cattle.  If the Court accepts his statement that he owns a one-half interest, where are the documents showing how many cattle existed at the outset of the Chapter 11, at the point in

time when the case was converted, and at the present time? The Debtor's testimony about the size of the herd was inconsistent and not credible.  This endeavor requires a ledger or journal or some other written document–apart from the welding operation's records–that chronicles the various cattle purchases and sales as well as the monies earned and expended for the venture during the period beginning when the Debtor was a debtor-in-possession in Chapter 11.  Yet the Debtor offered no written evidence to show and account for the growth or diminishment of the herd.

Pursuant to case law, the Trustee in the instant case is not required to prove that the Debtor intentionally  concealed his financial condition.  The Trustee has proved by a preponderance of the evidence that the Debtor's unexplained cash transfers and  failure to provide operating reports,  to account for funds transferred to Beth Lott, and  to document the size of the cattle herd make it impossible to ascertain the Debtor's financial condition.  Because the Debtor has not  justified the inadequacy of his records, the Court must deny the Debtor's discharge pursuant to Section 727(a)(3).

The Debtor's discharge having been denied for failure to keep adequate records, the Court declines to address the other grounds alleged as a basis to deny the Debtor's discharge. For this reason, the Court will not address the allegations pertaining to intent to hinder, delay, or defraud creditors and failure to explain loss of assets to meet liabilities in the Chapter 7 case.

## IV.

## COUNT II– DAMAGES AND OTHER FORMS OF REDRESS

Under Count II of the Trustee's Amended Complaint, the Trustee seeks  turnover, judgment,  an accounting, and punitive damages with regard to the unauthorized sale of property in December 2006, the transfers from the DIP accounts already discussed above, and numerous transfers of funds that occurred  prior to the filing of the Chapter 11 case.  The sale and the transfers will be discussed separately below as they relate to the Trustee's entitlement to redress.

A.

DEBTOR'S UNAUTHORIZED SALE OF PROPERTY

The Debtor is alleged to have conducted a "yard sale" of equipment and materials belonging to Charlie's Welding during December 2006.   The Trustee also alleges that the Debtor improperly sold 360,000 pounds of steel to AFCO in Crossett, Arkansas, for $25,200.00; however, the Trustee failed to present competent evidence to establish this allegation.

The evidence adduced at trial proves that on December 4 and 5,  2006, the Debtor sold $1,819.00 worth of material and equipment to Calhoun County, Arkansas, and $4,100.00 worth of material and equipment to  Blann Tractor Company. (Pl.'s Ex. 4 & 5.)  In separate transactions,  Blann Tractor Company purchased wire for  $100.00 on December 4, 2006, and a fuel tank for $500.00 on December 7, 2006. (Pl.'s Ex. 6 & 7.)

Sale proceeds totaled $6,519.00 and a portion of the proceeds was used to set off post-petition claims held by the purchasers or third parties.  The Debtor stated that he also used a portion of the proceeds to pay an electric bill and to pay residential rent.   A review of

the Court's file in the case reveals that the sales were not authorized by court order and creditors were not given notice as required by 11 U.S.C. § 363.  By his own admission, the Debtor did not deposit the sale proceeds in the debtor-in-possession account.

First, the Trustee alleges that by failing to pay the proceeds from the December 2006 sale of property to his Chapter 11 estate and to his Chapter 7 Trustee, the Debtor is liable for conversion and defrauding creditors.

The Debtor's case was filed January 13, 2006, under the provisions of Chapter 11. The Debtor, therefore, became a debtor-in-possession as a matter of law.   11 U.S.C. § 1101 (1)(2006)("'Debtor-In-Possession' means debtor except when a person that has qualified under section 322 of this title is serving in this capacity").  A debtor-in-possession has all of the rights and powers of a trustee serving in a Chapter 11 case, except the  right to compensation under Section 330.  11 U.S.C. § 1107 (2006).  A debtor-in-possession may operate the debtor's business.  11 U.S.C. § 1108 (2006).  The operation of the business does not require specific approval as long as it is in the ordinary course of the debtor's business. 11 U.S.C. § 363(c)(1)(2006).  The debtor-in-possession is not authorized to operate the debtor's business outside the ordinary course of business.  Gibson v. United States (In re Russell), 927 F.2d 413, 417 (8th Cir. 1991); Burlington N. R.R. Co. v. Dant & Russell, Inc. (In re Dant & Russell, Inc.),  853 F.2d 700, 703-704 (9th Cir. 1988).

When the Debtor sold some of the equipment and material, he was serving as a debtor-in-possession entitled to conduct sales in the ordinary course of business.  However, the sales described above were clearly not in the ordinary course of Charlie's Welding,

which operated as a steel fabricator.  Thus, the Debtor would have been entitled to sell the

various pieces of equipment and scrap inventory only after notice and a hearing, and clearly

he did not follow the proper procedure.

The Trustee's first legal theory is that the December sales amounted to conversion.

Under Arkansas law, conversion is a common-law tort action for wrongful possession or

disposition of another's property.  Hoffinger Indus., Inc. v. Rinehart (In re Hoffinger Indus.,

Inc.), 315 B.R. 74, 76 (Bankr. E.D. Ark. 2004) (citing McQuillan v. Mercedes-Benz Credit

Corp., 331 Ark. 242, 247,  961 S.W.2d 729, 732 (1998); Buck v. Gilham, 80 Ark. App. 375,

379, 965 S.W.3d 750, 753 (2003)).  Specifically, conversion is the exercise of dominion over

property in violation of the rights of the owner or person entitled to possession. Grayson v.

Bank of Little Rock, 334 Ark. 180, 188,  971 S.W.2d 788, 792 (1998)(citing City Nat'l Bank

v. Goodwin, 301 Ark. 182, 187, 783 S.W.2d 335, 338 (1990));  Alvarado v. St. Mary-Rogers

Memorial Hosp., 99 Ark. App. 104, *3, 257 S.W.3d 583, 587 (2007).

The intent required to prove conversion  is not conscious wrongdoing "but rather an

intent to exercise dominion or control over the goods that is in fact inconsistent with the

plaintiff's rights." Grayson, 334 Ark. at 188, 971 S.W.2d at 792;  Orsini v. Larry Moyer

Trucking, Inc., 310 Ark. 179, 184,  839 S.W.2d 180, 181 (1992) (citing Car Transp. v.

Garden Spot Distrib., 305 Ark. 82, 805 S.W.2d 632 (1991)).  In a conversion cause of action,

the plaintiff must prove an ownership interest or superior right in the thing converted and that

the right or interest was violated by the defendant.  Dickinson v. Simmons First Bank (In re

Cannco Contractor, Inc.), 135 B.R. 608,  610 (Bankr. E.D. Ark. 1991) (citing Big A

Warehouse Distrib, Inc. v. Rye Auto Supply, Inc., 19 Ark. App. 286, 719 S.W.2d 716 (1986)).

Pursuant to these guidelines,   the sale of equipment by the Debtor prior to his converting  the case to Chapter 7 did not amount to a conversion.  By definition, the Debtor, at that time, was a debtor-in-possession and, thus, was the person entitled to possession, not the Trustee.  While the Debtor did fail to receive Court approval or to give proper notice before he sold the property, his failure to follow appropriate procedure cannot be fairly equated to a conversion.

However, once the case was converted to Chapter 7, the Debtor's property became property of the estate and the Debtor was no longer the owner or the person entitled to possession.  After the case was converted, the Debtor's sale of property of the estate was an exercise of dominion or control that was inconsistent with the Trustee's rights and interests. Therefore, when the Debtor sold the fuel tank to Blann Tractor Company for  $500.00 on December 7, 2006, one day after the case was converted, he became liable for conversion.

The Trustee asks for punitive damages in addition to an award of actual damages. Arkansas law permits the award of  punitive damages for conversion if the plaintiff shows that the defendant intentionally exercised control or dominion over the plaintiff's property for the purpose of violating his right to the property or for the purpose of causing damages. National Hydro-Vac Indus. Servs., LLC. v. Fed. Signal Corp. (In re Nat'l Hydro-Vac Indus. Servs., LLC), 314 B.R. 753, 767  (Bankr. E.D. Ark. 2004) (citing City Nat'l Bank v. Goodwin, 301 Ark. 182, 188, 783 S.W.2d 335, 338 (1990)(citing Walt Bennett Ford, Inc. v.

26

<u>Keck</u>, 298 Ark. 424, 768 S.W.2d 28 (1989);  <u>McKenzie v. Tom Gibson Ford, Inc.</u>, 295 Ark. 326, 749 S.W.2d 653 (1988); <u>Ford Motor Credit v. Herring</u>, 267 Ark. 201, 589 S.W.2d 584 (1979))).

This Court has previously relied on the rule that punitive damages penalize conduct that is malicious or done with deliberate intent to injure.  <u>Nat'l Hydro-Vac</u>, 314 B.R. at 767 (citations omitted).  In determining whether punitive damages for conversion are appropriate, courts consider, among other elements, the relationship of the parties and the extent of wrongful dominion. <u>Id</u>.

Here, the Trustee points to no evidence from which the Court may infer malice and deliberate intent  to injure.  No evidence showed that  the Debtor was even aware of the appointment of a Trustee or that he knew she succeeded to a possessory interest in the property  sold after the conversion to Chapter 7 or that the Debtor intended any injury whatsoever.   That being the case, the Trustee failed to prove the malice necessary to prevail on the issue of punitive damages for the conversion.

As to the Trustee's allegation that the sale of the property amounted to fraud on the creditors in the case, the Court reiterates that while the Debtor failed to follow proper procedures in selling the materials and equipment pre-conversion, this conduct is not tantamount to actual  fraud.  Actual fraud "consists in deceit, artifice, trick, design, some direct and active operation of the mind; it includes cases of the intentional and successful employment of any cunning, deception, or artifice used to circumvent or cheat another." Black's Law Dictionary 661 (6th ed. 1991). In the instant case, the Court sees no deceit,

27

artifice, trick or design in the sales of materials and equipment either pre- or post-conversion to Chapter 7.  Had the Debtor wished to cheat his creditors, he would not have created a paper trail in the form of invoices documenting the sales from Charlie's Welding to Calhoun County and Blann Tractor Company.

For the reasons stated, the Court grants the Trustee judgment for $500.00 in damages for conversion of a fuel tank sold post-petition.  The request for turnover, an accounting, and punitive damages is denied.

B.

<u>JUDGMENT FOR DEBTOR'S  PRE- AND POST-PETITION  TRANSFERS</u>

The complaint seeks judgment against the Debtor for the unauthorized post-petition transfer of money from the debtor-in-possession accounts as listed on Exhibit A of the Complaint.  The Exhibit  includes many of the previously-discussed transfers to Beth, Cody, and Matthew Lott, monies expended for the funeral and related travel expenses, and unaccounted for  transfers from the debtor-in-possession account that are not explained as to payee and/or purpose.

The complaint also seeks judgment for pre-petition transfers as set out  in the complaint under Exhibit B. The Trustee has apparently expanded that list of pre-petition transfers to include additional items set out on Plaintiff's Exhibit 29.  This exhibit shows $80,632.84 in transfers  from the Debtor's accounts at Calhoun County and Farmers Bank between December 30, 2004, and November 7, 2005.  These transfers were to family members, the Debtor, to cash, other third parties, and  unknown payees.

28

1.

## POST PETITION TRANSFERS

The post-petition transfers to the Debtor's family and the transfers related to the Debtor's brother's funeral were not made in the ordinary course of the business of Charlie's Welding.  The unaccounted-for transfers may or may not have been in the ordinary course of the Debtor's business, but the Debtor's records are so poor and incomplete it is impossible to tell.

Unauthorized transfers not made in the ordinary course of business of a Chapter 11 debtor-in-possession may be recovered by a trustee of the converted Chapter 7 case. See, e.g., Aalfs v. Wirum (In re Straight Line Investments, Inc.), 525 F.3d 870, 879-81 (9th Cir. 2008)(unauthorized sale of the debtor's accounts receivable  by the debtor-in-possession was not in the ordinary course of business and could be avoided);  In re Dant & .Russell, Inc., 853 F.2d at  706 (unauthorized, post-petition leases entered into by the debtor-in-possession in the ordinary course of business were not avoidable by the trustee).

The basis for recovery for unauthorized, post-petition transfers not in the ordinary course of business is found in the Bankruptcy Code, which provides in relevant part,  "[T]he trustee may avoid a transfer of property of the estate . . . that occurs after the commencement of the case . . .  that is not authorized under this title or by the court."  11 U.S.C. § 549 (a)(1)&(2)(B) (2006).

Recovery of a transfer  avoided by the Trustee under Section 549 is governed by Section 550, which provides in relevant part:

29

> a)      except as otherwise provided in this section, to the extent that a
> transfer is avoided under Sections 544, 545, 547, 548, 549, 553(b) or 724(a)
> of this title, the trustee may recover, for the benefit of the estate,  the property
> transferred, or if the court so orders, the value of such property from–
>> (1)      the initial transferee of such transfer or the entity for whose benefit
>> such transfer was made; or
>> (2)      any immediate or mediate transferee of such initial transferee.

11 U.S.C. § 550(a)(1)-(2) (2006).

This section specifically excludes recovery from the transferor.   Judge Brozman

explained the reason for the exclusion of the transferor from liability under Section 550:

> Cases under the former bankruptcy act, which had a provision similar to
> Section 550, held consistently that the transferor is not the proper party to be
> held liable where a trustee is exercising his avoiding powers.  (Citations
> omitted.)   Such a holding recognized the very purpose of a trustee's avoiding
> powers, which is to preserve estate assets rather than to render civilly liable
> those who have dissipated  such assets.  (Citations omitted.) The theme under
> the act emerges in the code through Section 550.

Pereira v. Kaiser (In re Big Apple Scenic Studio, Inc.), 63 B.R. 85, 88 (Bankr. S.D.N.Y.

1986). See also  5 Collier on Bankruptcy ¶ 550.02[4] (Alan N. Resnick & Henry J. Sommer

et al. eds., 15th ed. rev. 1993) (stating that a debtor in a chapter 7 case is not a party benefitted

by a transfer and no recovery may be had from such debtor under Section 550(a)(1)).   But

see  Fitzgerald v. Beesley (In re Beesley), 139 B.R. 247 (Bankr. D. Idaho 1992)(awarding

judgment against the transferor/debtor and the transferee for the value of a transferred boat

under 11 U.S.C. §§ 550(a)(1) & 549 (2006)).   Cases that hold the debtor-transferor liable

under sections 549 and 550 ignore the specific language of section 550 and, therefore, are not

persuasive.

The evidence in the case demonstrates that the Debtor was the actual transferee of

funds from the debtor-in-possession account in only one instance: when he received $974.40 in funds on September 12, 2006. (Pl.'s Ex. 18B.) Because the debit does not appear to be a payroll check and the ledger does not account for the funds as a business expense, the Court infers this transfer was not in the ordinary course of business. Therefore, the Trustee may recover this amount in accordance with Sections 549 and 550.

2.

PRE-PETITION TRANSFERS

As to the pre-petition transfers, the Trustee does not allege a legal theory upon which to base a judgment in her favor for these amounts. If the Trustee's unstated theory is that these transfers were fraudulent and seeks to receive judgment against the Debtor pursuant to Sections 544 and/or 548, the complaint must fail for the reasons set out below.

Similar to Section 549, recovery under Sections 544 and 548 is governed by Section 550. Section 544 allows the trustee to avoid "any transfer of an interest of the debtor in property or any obligation incurred by the debtor that is voidable under applicable law by a creditor holding an unsecured claim that is allowable under Section 502. . . ." 11 U.S.C. § 544(b)(1) (2006). The section grants the trustee "the same rights as any unsecured creditor to avoid transfers under applicable state law." Forman v. Matthews Fin. Group, LLC (In re Halpert & Co., Inc.), 254 B.R. 104, 122 (Bankr. D. N.J. 1999); 5 Collier on Bankruptcy at ¶ 544.09[2].

Section 548 allows the trustee to avoid any fraudulent transfer of the debtor's property if the transfer either

31

> (i) had at its purpose an intent to hinder, delay or defraud the debtor's
> creditors, or (ii) was made while the debtor was in a precarious
> financial condition, and the transaction did not provide the debtor with
> a reasonably equivalent value in exchange for the item transferred or
> the obligation incurred.

5 Collier on Bankruptcy at ¶ 548.01.

Because Section 550 governs recovery of transfers by the trustee pursuant to Sections 544 and 548, the Trustee may not recover from the Debtor to the extent that the evidence fails to prove him to be a transferee. See Liebmann v. Pucci (In re Ampat S.Corp.), 128 B.R. 405, 411 (Bankr. D. Md. 1991) (stating that numerous courts have held a bankruptcy trustee can only recover fraudulent transfers from transferees)(citing Elliott v. Glushon, 390 F.2d 514 (9th Cir. 1967); Robinson v. Watts Detective Agency, 685 F.2d 729 (1st Cir. 1982)).

As to the numerous transfers by check, debit or cash alleged to have been made directly to the Debtor pre-petition, the Trustee has offered no proof of the badges of fraud to prove fraudulent intent or of the Debtor's pre-petition insolvency, as would be required under a fraudulent transfer theory for either actual or constructive fraud.

For these reasons, the Trustee is not entitled to a judgment for the Debtor's pre-petition transfers.

## C.

### OTHER ALLEGATIONS UNDER COUNT II

Also under Count II, the Trustee seeks turnover, judgment, an accounting, and punitive damages with regard to numerous other allegations stated in Count I and incorporated into Count II. These allegations include that the Debtor conducted a "yard sale"

of equipment and assets in December 2006; that the Debtor's operating reports were false, inaccurate, and/or nonexistent; that the Debtor disposed of assets including "show cattle"; that the Debtor generally failed to explain assets to meet liabilities; and that the Debtor owns substantial assets held in the names of third parties.  The Court finds that the evidence did not establish these additional allegations as fact and/or that the Trustee did not plead a legal theory regarding the allegations that would entitle the Trustee to the relief requested.

Additionally, the Trustee seeks turnover or judgment for the value of a sawmill. However, the Trustee offered no evidence to support the allegation that the Debtor owns a sawmill.  Further, the Trustee requests turnover and an accounting for all transferred property and judgment against the Debtor in an amount to be established by the proof at trial. The proof does not establish what specific property for which the Trustee is entitled to a turnover order, with the exception of seven or eight head of cattle located in Oklahoma.  The evidence is that ownership of the cattle is claimed by the Debtor and his two sons.  The Debtor's two sons are not parties to this action; therefore, the complaint for turnover as to the cattle is dismissed without prejudice.

In view of the poor records of the Debtor there appears to be little likelihood that a meaningful accounting can be accomplished.  Therefore, the Trustee's request in this regard is denied. As to punitive damages, the Court has denied punitive damages with regard to the Debtor's liability for conversion, above.  As to the other allegations in the complaint, the Trustee has not alleged or argued a legal theory upon which punitive damages may be based.

**V.**

33

## **CONCLUSION**

The evidence is convincing that the Debtor exercised no fiscal discipline whatsoever and failed to keep adequate records.   Moreover, the U. S. Trustee's office failed completely to discharge its oversight responsibility in this case.  The Debtor-In-Possession spent estate money like a drunk sailor, dealt in large sums of cash, and kept incoherent records.  The last operating report was filed for the April 2006 period and  did not include bank statements or cancelled checks.  Despite the fact that the Debtor remained a debtor-in-possession until December of 2006, the U.S. Trustee took no action of any kind with regard to the missing reports.   The U. S. Trustee bears considerable responsibility for the disaster this case has become.

The Debtor's discharge is denied for the failure to keep adequate records for the reasons stated above in III--Objection to Discharge. The Trustee shall have judgment against the Debtor for $500.00 for conversion and $974.40 for an unauthorized post-petition transfer in which he was the transferee. All other claims under Count II are dismissed.

A separate judgment will be entered in accordance with the provisions of this Memorandum Opinion.

IT IS SO ORDERED.

_____

U. S. BANKRUPTCY JUDGE

DATE:_____09/23/08_____

cc:     Charles Tucker, Assistant U. S. Trustee
        Renee S. Williams, Trustee

34

Thomas S. Streetman, Esq.
Basil V. Hicks, Esq.
C. Richard Crockett, Esq.
Debtor